United States District Court
Southern District of Texas
**ENTERED**
January 30, 2017
David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| SPORTSTAR ATHLETICS, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | Civ. A. H-15-1438 |
| | § | |
| WILSON SPORTING GOODS CO., | § | |
| | § | |
| | § | |
| Defendant. | § | |

**FINDINGS OF FACT, CONCLUSIONS OF LAW, CONSTRUCTION OF CLAIMS**

The above referenced case, alleging that Defendant Wilson Sporting Goods ("Wilson"), based on its Wilson Football Chin Strap, is liable for deliberately, intentionally and willfully committing direct, induced, and contributory patent infringement,[1] is currently before this Court for construction of

---

[1] Title 35 U.S.C. § 271(a) recites in relevant part,

(a) Except as otherwise provided in this title, whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent. [direct infringement]

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

(c) Whoever offers or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer.

The patent holder must establish direct infringement (§ 271(a)) as

disputed terms in two patents for chin guard apparatuses for football helmets, licensed by Plaintiff Sportstar Athletics, Inc. ("Sportstar"): (1) U.S. Patent No. 7,735,160 ("the '160 Patent" for "Chin Guard Apparatus For Use With a Helmet," issued by the Patent and Trademark Office ("PTO") on June 15, 2010),[2] called by Sportstar the "original strap splitter patent"; and (2) U.S. Patent No. 8,621.671 ("the '671 Patent" for "Protective Chin Guard," issued by the PTO on January 7, 2014),[3] called by Sportstar the "any strap splitter patent," a continuation-in-part

---

a predicate for each act of indirect infringement under § 271(b) and (c)). *Dynacore Holdings Corp. v. U.S. Phillips Corp.*, 363 F.3d 1263, 1272 (Fed. Cir. 2006)("indirect infringement . . . can only arise in the presence of direct infringement, though the direct infringer is typically someone other than the defendant accused of indirect infringement.")."A plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts and that he knew or should have known his actions would induce actual infringements," i.e., "including that he or she knew of the patent." *epicRealm, Licensing, LLC v. Autoflex Leasing Inc.*, 492 F. Supp. 2d 608, 615-16 (E.D. Tex. 2007), *citing DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1304, 1306 (Fed. Cir. 2006)(Inducement "requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities.").

[2] A copy of the '160 patent is found at #26, Ex. 2; the '160 patent file history, at Exs. 3-4.

[3] A copy of the '671 patent is found at #26, Ex. 8 (#26-9) and the patent file history, #26, Ex. 9 (#26-20).

("CIP") of the '160 Patent[4] that serves to broaden the claims of the '160 Patent.[5]

A *Markman* hearing[6] was held on March 23, 2016.

---

[4] "A 'continuing patent application' is an application filed subsequently to another application, while the prior application is pending, disclosing all or a substantial part of the subject-matter of the prior application and containing claims to subject-matter common to both applications, both applications being filed by the same inventor or his legal representative." *U.S. Water Services, Inc. v. Novozymes A/S*, 843 F.3d 1345 (Fed. Cir. 2016). Where a third patent is a continuation-in-part of a second patent, which in turn is a continuation of the first patent [as is the case with the '774 Application, the 160' Patent, and the '671 Patent, to be discussed], the prosecution histories of the first and second patents apply with equal force to the interpretation of the continuation-in-part patent claims. *ICN Pharmaceuticals, Inc. v. Genera Pharmaceuticals Technology Corp.*, 272 F. Supp. 2d 1028, 1043 (C.D. Cal. 2003). Prior art that the inventor disclosed in a parent application need not be disclosed again in a continuation application. *Nomadix, Inc. v. Hospitality Core Services, LLC*, No. CV 14-08256 DDP (VBKx), 2015 WL 3948804, at *8 (C.D. Cal. June 29, 2015).

[5] "[A] patent applicant is not precluded from filing a continuation application with broader claims. It is recognized that an applicant can broaden as well as restrict his claims during the procedures of patent examination, and that continuing applications may present broader claims than were allowed in the parent," but he "cannot recapture claim scope that was surrendered or disclaimed." *Hakim v. Cannon Avent Group, PLC*, 479 F.3d 1313, 1317 (Fed. Cir.), *cert. denied*, 552 U.S. 951 (2007).

[6] *Markman v. Westview Instruments, Inc,* 52 F.3d 967 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996). The goal of a *Markman* hearing is to determine the ordinary and customary meaning of claim terms as seen by "a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005)(*en banc*), *cert. denied*, 546 U.S. 1170 (2006). Such a person reads the claim term not only in the context of the specific claim in which it appears, but also in the context of the entire patent, including the specification. *Kwitek v. Pilot Corp.*, 516 F. Supp.2d 709, 712 (E.D. Tex. 2007), *citing Phillips*, 415 F.3d at 1313. "'[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.*, *citing Phillips*, 415 F.3d 1315, *quoting Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).

Specifically, the parties dispute the meaning of following claim terms or claim elements in the two patents: "strap splitter" (in claims 1,8,9,12, and 13 of the '160 patent and in claims 7,8,10, and 17 of the '671 patent); "In said second slot" (in claims 1,9, and 12 of the '160 patent); "stop" (in claims 9 and 18 of the '671 patent); and "greater than" (in claims 1 and 9 of the '160 patent).[7]   Sportstar contends that Wilson Hard Cup Football chin straps, including model numbers WTF985000 and WRF985001, infringe Claims 1 and 12 of the '160 Patent and Claims 7 and 10 of the '671 Patent.

After hearing the arguments regarding the parties' proposed constructions of the disputed claim terms at the *Markman* hearing, and after careful review of the record, including the claim language, specifications, and prosecution histories of the patents-in-issue, as well as of the law, the Court enters the following Findings of Fact and Conclusions of Law construing the disputed terms as a matter of law pursuant to Federal Rule of Civil Procedure 52(a).

## Findings of Fact

Sportstar is a corporation organized under the laws of the State of Texas and is the licensee of the rights to the '160 and '671 patents.

Wilson was incorporated under the laws of the State of Delaware, has its principal place of business at 8750 W. Bryn Mawr

---

[7] The term "cup" is no longer in dispute as both parties agree that it should be given its plain and ordinary meaning. #28, p.1. n.1; #25, p. 15.

Avenue, Chicago, Illinois 60631, and is a major manufacturer of sports equipment and paraphernalia.

The sole inventor of the Sportstar chin guards and the owner of the two Patents-in-issue is Paul Schiebl, the president of Sportstar, who has licensed the substantial rights to the '160 and '671 Patents to Sportstar.[8]

Before Schiebl's invention, existing chin straps for football helmets were made for attachment to either the high hookup or the low hookup of a football helmet, depending on the configuration of the player's face and the amount of protective performance he desires from the chin strap; if a player wanted to be able to hook up to both high and low hookups, he had to have separate chin straps for each kind of hookup.

There was no expert testimony, but only arguments of counsel and the record at the *Markman* hearing.

## Conclusions of Law

*Applicable Law*

This Court has original and exclusive jurisdiction under 28 U.S.C. §§ 1331 and 1338(a) over this action for patent infringement.

"[W]hoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or

---

[8] A party may sue for patent infringement only if it owns the patent (i.e., is the "patentee") by issuance or assignment. *Kothmann Enterprises, Inc. v. Trinity Industries, Inc.*, 394 F. Supp. 2d 923, 941(S.D. Tex. 2005). "'A party that has been granted all substantial rights under a patent is considered the owner and is entitled to bring an infringement action, regardless of how the parties characterize the transaction that conveyed those rights.'" *Id.*

imports into the United States any patented invention during the term of the patent therefor, infringes the patent."  35 U.S.C. § 271.

Patent claim construction is a matter of law for the court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 977 (Fed. Cir. 1995)(*en banc*), *aff'd*, 517 U.S. 370 (1996); *Allen Engineering Corp. v. Bartell Industries, Inc.*, 299 F.3d 1336, 1344 (Fed. Cir. 2002).

A patent is a fully integrated written instrument memorializing a grant by the government to the patentee of rights for a limited time to exclude others from making, using, or selling the invention described in the patent.  *Markman*, 52 F.3d at 978.   To determine whether infringement of a patent has occurred, the court first decides the correct scope and meaning of each claim and then compares the "construed claim to the accused device to determine whether all of the claim limitations are present literally or by a substantial equivalent."  *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1247-48 (Fed. Cir. 1998); *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998)(en banc).   The first step, the construction of the claim, is an issue of law to be decided by the Court; the second is a factual question.  *Dynacore Holdings Corp. v. Philips Corp.*, 363 F.3d 1263, 1273 (Fed. Cir. 2004); *see also MBO Laboratories, Inc. v. Becton, Dickinson Cos.*, 474 F.3d 1323, 1329 (Fed. Cir. 2007)("A determination of patent infringement requires a two-step analysis:  first the meaning of the claim language is construed, then the facts are applied to determine if the accused device

falls within the scope of the claims as interpreted."), *citing Markman*, 52 F.3d at 976.  In other words, "claim construction is the court's 'power and obligation' in a jury case.  The court's construction permits the jury in the second step of the suit to decide the fact question of infringement, which requires a comparison of properly construed patent claims and the alleged infringer's device or process." *Logan v. Hormel Foods, Inc.*, No. Civ. A. H-05-0055, 2005 WL 2171893, at *2 (S.D. Tex. 2005), *aff'd*, 217 Fed. Appx. 942 (Fed. Cir. Jan 25, 2007), *cert. denied*, 552 U.S. 941 (2007).

To determine the meaning of the claims one must view them in the context of "those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean." *Phillips*, 415 F.3d at 1314.

In construing the claim limitations, the court first examines the intrinsic evidence, i.e., "the written description, the drawings, and the prosecution history, if in evidence." *Allen Engineering*, 299 F.3d 1344.  The three primary sources of intrinsic evidence for ascertaining the meaning of patent claims in the order of importance are (1) the words of the claims in the patent, (2) the specification, and (3) the prosecution history (also known as the "file wrapper"). *US Foam, Inc. v. On Site Gas Systems, Inc.*, 735 F. Supp. 2d 535, 541 (E.D. Tex. 2010).[9]

---

[9] In *Phillips*, 415 F.3d at 1317 (citations omitted), the panel observes that an invention is construed in light of the claim language, the prosecution history in the PTO, and the specification:

The prosecution history . . . consists of the

Different weights are imposed on different sources, with the most relevant being the patent's specification,[10] "which is 'the single best guide to the meaning of a disputed term.'"   *MBO*, 474 F.3d at 1329, *quoting Vitronics Corp. v. Conceptronic, Inc.*,90 F.3d 1576, 1582 (Fed. Cir. 1996).  Section 112 of the Patent Act, 35 U.S.C. § 112, opens with the statement that the specification "shall contain a written description of the invention, and of the

---

complete record of the proceedings before the PTO and includes the prior art cited during the examination of the patent.  Like the specification, the prosecution history provides evidence of how the PTO and the inventor understood the patent.  Furthermore, like the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent.

The prosecution history contains "any express representations made by the applicant regarding the scope of the claims," *B-50.com, LLC v. Xformity, Inc.*, Civ. A. No. 3:04-CV-0542-B, 2006 WL 6248254, at *2 (N.D. Tex. Feb. 23. 2006).  "'Prosecution history estoppel requires that the claims of a patent be interpreted in light of the proceedings in the PTO during the application process. Estoppel is a 'rule of patent construction' that ensures that claims are interpreted by reference to those'that have been cancelled or rejected.'"  *Festo Corp. v. Shoketsu Kinzoku Kyogyo Kabushiki Co., Ltd.*, 535 U.S. 722, 733 (2002).  "'Prosecution history estoppel . . . preclud[es] a patentee from regaining, through litigation, coverage of subject matter relinquished during prosecution of the application for the patent.'" *Festo Corp.*, 535 U.S. at 734, 737 (2002), *quoting Wang Laboratories, Inc. v. Mitsubishi Electronics America, Inc.*, 103 F.3d 1571, 1577-78 (Fed. Cir. 1997). Nevertheless prosecution history does not apply each time a patent application is amended but only for limited reasons, e.g., "to avoid the prior art, or otherwise to address a specific concern--such as obviousness--that arguably would have rendered the claimed subject matter unpatentable." *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 30-31 (1997).

[10] The patent claims are "part of 'a fully integrated written instrument,' consisting principally of a specification that concludes with the claims," so the "claims 'must be read in view of the specification of which they are a part.'" *Phillips*, 415 F.3d at 1315, *quoting Markman*, 52 F.3d 978-79.

manner and process of making and using it, in such full, clear concise and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same . . . ."  The second paragraph recites that the specification "shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention."  "[W]e look to the words of the claims themselves . . . to define the scope of the patented invention." *Vitronics*, 90 F.3d at 1582.  Furthermore because the claims are part of "a fully integrated written instrument," comprised mainly of the specification, they "must be read in view of the specification." *Markman*, 52 F.3d at 978, 979.

Next in significance is the prosecution history, which simultaneously is also part of the "'intrinsic evidence' that directly reflects how the patentee has characterized the invention." *Id., citing id.* at 1317.  The prosecution history, if in evidence, includes the complete record before the PTO and the prior art cited during the examination of the patent. *Phillips*, 415 F.3d at 1317.  The prosecution history "can often inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it otherwise would be." *Phillips*, 415 F.3d at 1317. It includes "all express representations made by or on behalf of the applicant to the examiner to induce a patent grant, or . . . to reissue a patent[,] . . . . includ[ing] amendments to the claims and arguments made to convince the examiner that the

claimed invention meets the statutory requirements for a patent of novelty, utility, and nonobviousness.  35 U.S.C. §§ 101-103.  Thus the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985)  Because the prosecution history is created by the patentee as he tries to obtain a patent, it reflects the ongoing negotiations rather than their final product and lacks the clarity of and is less helpful for claim construction than the specification.  *Id.*  Yet it can also "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id., citing Vitronics*, 90 F.3d at 1582-83.

Finally extrinsic evidence, including expert testimony, dictionaries, learned treatises, or other material not part of the public record associated with the patent, may be helpful, but is less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id., citing id.*  It may be less reliable because it is not part of the patent, is not created at the time of the patent prosecution, may not reflect the understanding of a skilled practitioner in the field of the patent, and may be created for litigation and contain bias toward the offeror's contentions.  *Id.* at 1318.  While claim construction "involves consideration of primarily the intrinsic evidence, *viz.*,

the claim language, the specification, and the prosecution history," underlying factual determinations made by the district court [are] based on extrinsic evidence and are reviewed for clear error. *Biosig Instruments, Inc. v. Nautilus, Inc.*, 783 F.3d 1374 (Fed. Cir.)(*citing Teva Pharm.*, 135 S. Ct. at 842), *cert. denied*, 136 S. Ct. 569 (2015).

In sum, a court is not "barred from considering any particular sources or required to analyze sources in any specific sequence, as long as those sources are not used to contradict claim meaning that is unambiguous in light of the intrinsic evidence. . . . [W]hat matters is for the court to attach the appropriate weight to be assigned to those sources in light of the statutes and policies that inform patent law." *Id,* at 324. In most cases the intrinsic evidence by itself will resolve any ambiguity in the disputed claim term and then reliance on extrinsic evidence would be improper; only where there is ambiguity in the intrinsic evidence may the court rely on extrinsic evidence. *Phillips*, 415 F.3d at 1316. *Vitronics*, 90 F.3d at 1582.

In ascertaining the meaning of the claims, the court views them "in the context of 'those sources available to the public that show what a person of skill in the art would have understood disputed claim language to mean.'" *MBO*, 474 F.3d at 1329, *citing Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005)(*en banc*)(*quoting Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 111 (Fed. Cir. 2004)), *cert. denied*, 546 U.S. 1170 (2006). In *Phillips*, *id.*, the appellate

court quoted *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1477 (Fed. Cir. 1998), to explain that

> the person of ordinary skill in the field of the invention through whose eyes the claims are construed is deemed to read the words used in patent documents with an understanding of their meaning in the field, and to have knowledge of any special meaning and usage in the field.  The inventor's words that are used to describe the invention--the inventor's lexicography--must be understood and interpreted by the court as they would be understood and interpreted by a person in that field . . . .  Thus the court starts the decisionmaking process by reviewing the same resources as would that person, *viz.*, the patent specification and the prosecution history.

*Id., citing Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005)("We cannot look at the ordinary meaning of the term in a vacuum.  Rather, we must first look at the ordinary meaning in the context of the written description and the prosecution history."); *V-Formation, Inc. v. Benetton Group SpA,* 401 F.3d 1307, 1310 (Fed. Cir. 2005)(intrinsic record "usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention."); *Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.*, 375 F.3d 1341, 1351 (Fed. Cir. 2005)(proper definition is the "definition that one of ordinary skill in the court could ascertain from intrinsic evidence in the record."), *rev'd on other grounds*, 546 U.S. 394 (2006).  *See also Lexion Medical, LLC v. Northgate Tech, Inc.*, 641 F.3d 1352, 1356 (Fed. Cir. 2012)(interpretation of a claim term "should be harmonized, to the extent possible, with the intrinsic record as

understood within the technological field of the invention."). The hypothetical person of ordinary skill in the art in question at the time of the invention is presumed to be aware of all relevant prior art. *Custom Accessories, Inc. v. Jeffrey-Allan Indus., Inc.*, 807 F.2d 955, 962 (Fed. Cir. 1986).

"A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." *Festo Corp.*, 535 U.S. at 740, *citing Exhibit Supply Co. v. ACE Patents Corporation*, 315 U.S. 126, 136-37 (1942)("By the amendment [the patentee] recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference."). In some cases the amendment "cannot reasonably be viewed as surrendering a particular equivalent" that might have been unforeseeable at the time of application; in such cases "the patentee can overcome the presumption that prosecution history estoppel bars a finding of equivalence." *Id.* at 740-41. To rebut the presumption that prosecution history estoppel bars a finding of equivalence, the patentee must show that at the time of amendment, one skilled in the art could not reasonably be expected to have drafted a claim that would have literally encompassed the alleged equivalent." *Id.* at 741. "The applicant having limited his claim by amendment and accepted a patent, brings himself with the rules that if the claim to a combination be restricted to specified elements, all must be regarded as material, and that limitations imposed by the inventor, especially such as were introduced into an application

after it had been persistently rejected, must be strictly construed against the inventor and looked upon as disclaimers." *I.T.S. Rubber Co. v. Essex Ruber Co.*, 272 U.S. 429, 443-44 (1926). Afterward the patentee is estopped from seeking the benefit of his rejected claim or a construction of his amended that would be an equivalent of the rejected claim. *Id.* at 444. The doctrine of prosecution disclaimer precludes patentees from recapturing through claim interpretation particular meanings disclaimed during prosecution even if the disclaimers were not required to make the invention patentable. *PrinterOn Inc. v. BreezyPrint Corp.*, 93 F. Supp. 3d 658, 672 (S.D. Tex. 2015), *citing Omega Eng'g*, 334 F.3d at 1323; *SanDisk Corp. v. Memorex Prods., Inc.*, 415 F.3d 1278, 1286 (Fed. Cir. 2013); and *Uship Intellectual Props., LLC v. U.S.*, 713 F.3d 1311, 1315 (Fed. Cir. 2013).

Sometimes the patentee chooses "to be his own lexicographer and use terms in a manner other than their ordinary meaning, as long as the special definition of the term is clearly stated in the patent specification or file history." *Vitronics*, 90 F.3d at 1582, *citing inter alia Hormone Research Foundation, Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1563 (Fed. Cir. 1990)("It is a well-established axiom in patent law that a patentee is free to be his or her own lexicographer."). When the definition to a claim in the specification differs from the special definition given to a claim term by the patentee, the latter, i.e., the inventor's lexicography, prevails. *Phillips*, 415 F.3d at 1316. Nevertheless, there is a "'heavy presumption' that claim terms carry their full ordinary and customary meaning unless the

patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution." *Omega Engineering, Inc. v. Rytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *Biogen Idec, Inc. v. GlaxoSmithKline LLC*, 713 F.3d 1090, 1095 (Fed. Cor. 2012)(same; "Thus, when the patentee unequivocally and unambiguously disavows a certain meaning to obtain a patent, the doctrine of prosecution history disclaimer narrows the meaning of the claim consistent with the scope of the claim surrendered."); *Thorner v. Sony Computer Entertainment America LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012)("There are only two exceptions to [the] general rule [that words of a claim are generally given their ordinary and customary meaning as understood by a person of ordinary skill in the art when read in the context of the specification and prosecution history]: 1) when a patentee sets out a definition and acts as his own lexicographer [by clearly expressing an intent to redefine the term], or 2) when the patentee [clearly] disavows the full scope of a claim either in the specification or during prosecution" (*citing Vitronics Corp.*, 90 F.3d at 1580).[11] "When a patentee responds to the rejection by

---

[11] In *Biogen Idec*, 713 F.3d at 1095 (citations omitted), the Federal Circuit further explained,

> Prosecution history disclaimer plays an important role in the patent system. It "promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." Such statements can take the form of either amendment or argument. For this reason, the entirety of a patent's file history captures the public record of the patentee's representations concerning the scope and meaning of the claims. "[I]t is

narrowing his claims, this prosecution history estops him from later arguing that the subject matter covered by the original, broader claim was nothing more than an equivalent," that the broader limitation is equivalent to the narrower limit he claimed. *Festo*, 535 U.S. at 727, 735.[12]   "Competitors may rely on the

---

> totality of the prosecution history that must be assessed, not just the individual segments of the presentation made to the [PTO] by the applicant . . . ."  Competitors are entitled to rely on those representations when determining a course of lawful conduct, such as launching a new product or designing-around a patented invention.   Beyond the notice function and reliance-based aspects of a patent's prosecution history, it "provides evidence of how the [PTO] and the inventor understood the patent."

[12]   The two uses of prosecution history must be distinguished:   (1) using the contents of the prosecution to resolve disputed language in claims and (2) the doctrine of prosecution estoppel, which estops or restricts later expansion of the protection given by the claim to the patent owner under the doctrine of equivalents when the claims have deliberately been amended or distinguished over prior art to give up scope. *Biodex Corp. v. Loredan Biomedical, Inc.*, 946 F.2d 850, 862 (Fed. Cir. 1991); *see also Ballard Med. Prods. v. Allegiance Healthcare Corp.*, 268 F.3d 1352, 1358-59 (Fed. Cir. 2001)("Just as prosecution history estoppel may act to estop an equivalence argument under the doctrine of equivalents, positions taken before the PTO may bar an inconsistent position on claim construction."); *McGill, Inc. v. John Zink, Co.*, 736 F.2d 666, 673 (Fed. Cir.), *cert denied*, 469 U.S. 1037 (1984)(two contexts for prosecution history-estoppel and claim construction tool).   *Trading Technologies Intern., Inc. v. Open E Cry, LLC*. 728 F.3d 1309, 1332 (Fed. Cir. 2012)("Prosecution history estoppel applies as part of an infringement analysis to prevent a patentee from using the doctrine of equivalents to recapture subject matter surrendered from the literal scope of a claim during prosecution.  Prosecution disclaimer, on the other hand, affects claim construction and applies where an applicant's actions during prosecution prospectively narrow the literal scope of an otherwise more expansive claim limitation.  Though distinct, both doctrines serve to constrain the enforceable scope of patent claims commensurate with any subject matter surrendered during prosecution to obtain the patent, and a single action during prosecution can engender both a prosecution disclaimer and prosecution history estoppel.

estoppel to ensure that their own devices will not be found to infringe by equivalence." *Id.*  "'The prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disallowed during the prosecution in order to obtain claim allowance.'"  *Omega Engineering, Inc. v. Raytec Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003), *quoting Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

In a continuation patent, e.g., the '671 patent, the inventor "has the right to refile the application and attempt to broaden the claims" as long as he has not previously surrendered or disclaimed the claim scope.  *Hakim v. Cannon Avent Group, PLC* 479 F.3d 1313, 1317 (Fed. Cor. 2007).

"A patentee's decision to narrow his claims through amendment may be presumed to be a general disclaimer of the territory between the original claim and the amended claim." *Festo*, 535 U.S. at 740, *citing Exhibit Supply*. 315 U.S. at 136-37 ("By the amendment [the patentee] recognized and emphasized the difference between the two phrases and proclaimed his abandonment of all that is embraced in that difference.").  The doctrine applies even if the disclaimers were not needed to made the invention patentable by overcoming a claim rejection.  *Uship Intellectual Props.* 713 F.3d at 1315; *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1583 (Fed. Cir. 1995)("Estoppel extends beyond the basis of patentability . . . . Clear assertions

---

[citations omitted]."

made during prosecution in support of patentability, whether or not actually required to secure allowance of the claim, may also create an estoppel."). It does not apply to statements in which the disavowal is ambiguous. *Omega Eng'g*, 334 F.3d at 1324.

Furthermore, "[b]ecause claim terms are normally used consistently throughout the patent, the usage of a term in one claim can often illuminate the meaning of the same term in other claims." *Phillips*, 415 F.3d at 1314. "[A] claim term should be construed consistently with its appearance in other places in the same claim or in other claims of the same patent. *Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1342 (Fed. Cir. 2001), *citing Phonometrics, Inc. v. Northern Telecom, Inc.*, 133 F.3d 1459, 1465 (Fed. Cir. 1998)("A word or phrase used consistently throughout a claim should be interpreted consistently."); *CVI/Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1159 (Fed. Cir. 1997)("[W]e are obliged to construe the term 'elasticity' consistently throughout the claims."); *South wall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1579 (Fed. Cir. 1995)(holding that claim terms found in different claims should be interpreted consistently).

A patent is not limited to the preferred embodiments, or examples provided in the intrinsic record, even if there is only one, "unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'" *Liebel-Flarsheim Co. v. Medrad*, 358 F.3d 898, 906 (Fed. Cir. 2004), *citing Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1327 (Fed. Cir. 2002); *Hill-Rom*

*Services, Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371-72 (Fed. Cir. 2014).

"When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same limitation." *Elkay Mfg. Co. v. Ebco Mfg. Co.*, 192 F.3d 973, 980 (Fed. Cir. 1999), *citing Jonsson v. The Stanley Works*, 903 F.2d 812, 817-18 (Fed. Cir. 1990)("holding that when two patents issued from continuation-in-part applications derived from one original application, the prosecution history of a claim limitation in the first patent to issue was properly applied to the same claim limitation in the second patent to issue."); *in accord*, *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1371 (Fed. Cir. 2014).

To prevail on a claim of direct infringement, a plaintiff must prove by a preponderance of the evidence that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents. *Advanced Cardiovascular Sys., Inc. v. Scimed Life Sys., Inc.*, 261 F.3d 1329, 1336 (Fed. Cir. 2001). To establish literal infringement, a plaintiff must demonstrate that "every limitation set forth in a claim must be found in an accused product, exactly." *South wall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1575 (Fed. Cir. 1995). Any deviation from the literal claim language bars a literal infringement finding. *Telemaco Cellular Corp. v. Top Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).

The Federal Circuit describes infringement under the doctrine of equivalents as "requir[ing] that the accused product contain each limitation of the claim or its equivalent." *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1331 (Fed. Cir. 2001), *citing Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)("noting that because each limitation contained in a patent claim is material to defining the scope of the patented invention, a doctrine of equivalents analysis must be applied to individual claim limitations, not to the invention as a whole."). To prevail on an infringement claim, the plaintiff must demonstrate the presence of every element [for literal infringement] or its substantial equivalent [for infringement under the doctrine of equivalents] in the accused device." *The Boeing Co. v. U.S.*, 69 Ct. Cl. 397, 426 (Fed. Cl. 2006), *ruled infringed*, 86 Fed. Cl. 303 (Fed. Cl. 2009), *remanded*, 374 Fed. Appx. 955 (Fed. Cir. 2009). As the Federal Circuit has opined,

> A finding of infringement under the doctrine of equivalents requires a showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result in each claim limitations of the patented product or method. [*AquaTex Industries, Inc. v. Techniche Solutions*, 419 F.3d 1374, 1382 (Fed. Cir. 2005)]; *see also Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 . . . (1950).

The latter is known as the "function, way, result test." *AquaTex Industries, Inc. v. Techniche Solutions*, 479 F.3d 1320, 1326 Fed. Cir. 2007). "A claim limitation and an element in an accused

device are equivalents if a person of ordinary skill in the art would find the differences to be insubstantial." *Colucci v. Callaway Golf Co.*, 748 F. Supp. 2d 629, 632 (E.D. Tex. 2010), *citing Amgen, Inc. v. F. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1382 (Fed. Cir. 2009).  The patentee bears the burden of showing infringement under the doctrine of equivalents by particularized testimony, typically from a qualified expert, and argument regarding the insubstantiality of the differences between the claimed invention and the accused device on a limitation-by-limitations basis. *Colucci*, 748 F. Supp. 2d at 631, *citing AquaTex*, 479 F.3d at 1328.

**Court's Construction**

After a careful review of the record, the Court concludes that Sportstar's construction of the claims in the patents-in-issue fails to follow the rules of patent construction, while Wilson has applied them properly.

The Court agrees with Wilson that Sportstar's proposed constructions diverge from the required process of construing patent terms in the light of the intrinsic evidence, especially the claim language, the specification, and the prosecution history.  Instead Sportstar improperly tries to broaden the patents' claims to recapture subject matter that the patentee Schiebl relinquished during prosecution of the patent.  Moreover, Sportstar changes the name of the '160 patent ("Chin Guard Apparatus for Use with a Helmet") to "Original Strap Splitter Patent," a misnomer historically and factually because helmet

-21-

strap splitters are common in the prior art[13] and because "strap splitter" is used in both patents in issue.  Sportstar also changed the name of the '671 Patent ("Protective Chin Guard") to "Any Strap Splitter Patent," also a misnomer because the prevalent prior art  anticipates each asserted claim or renders it obvious, including the strap splinter element from the abandoned '774 Application.

The Court agrees with Wilson that the prosecution history of the patents in issue, which Sportstar ignores, is essential to properly construing the terms in dispute here.[14]  The '671 Patent is a continuation in part of the '160 Patent, and therefore the statements regarding the terms or elements made during the prosecution of the '160 Patent also apply to the '671 Patent.   The two patents also claim the same filing date. Furthermore the prosecution history of the first, the '160 Patent, applies equally to the later, continuation-in-part '671 Patent. *Elkay*, 192 F.3d at 980 ("When multiple patents derive from the same initial application, the prosecution history regarding a claim limitation in any patent that has issued applies with equal force to subsequently issued patents that contain the same limitation.").  Moreover, the '160 Patent is also a continuation-in-part of an even earlier Schiebl patent application, No.

_____

[13] See Defendant's Preliminary Invalidity Contentions for U.S. Patent No, 7,735,160 (Ex. B).

[14] This Court disagrees with Sportstar's contention (#29 at p. 2) that Wilson confuses prosecution history estoppel with prosecution disclaimer.  See footnote 12.  The Court notes that Sportstar discusses the difference generally, but does not point to any specific instances of confusion by Wilson.

10,463,774 ("'774 Application"), filed on June 17, 2003, which was rejected three times and then abandoned.  The '774 Application contained the term "strap splitter," which Schiebl included in the '160 Patent Application with new claims, which Schiebl filed on September 8, 2005 and is a continuation-in-part of the '774 application.  After the PTO initially rejected all the claims of the '160 Patent Application, Schiebl filed an amendment deleting all 20 of its claims and replacing them with new claims with new language in bold in an effort to convince the examiner to allow them:

> 21.  A chin guard apparatus for use with a helmet **in which the helmet has a high hook-up and a low hook-up, the chin guard apparatus** comprising:
> a shell having a cup suitable for fitting upon a human chin, said shell having an outer peripheral edge, **said shell having a single first strap-receiving slot adjacent on one side of said shell and a single second strap-receiving slot adjacent [o]n opposite side of said shell:**
> a resilient layer received within said cup of said shell, said resilient layer having a periphery overlying said outer peripheral edge of said shell;
> a first strap **extending through said first strap-receiving slot of said shell and** extending outwardly therefrom, said first strap suitable for attachment to the helmet;
> a second strap **extending through said second strap-receiving slot of said shell and** extending outwardly therefrom, said second strap suitable for attachment to the helmet; and
> **a first strap splitter through which said first strap extends, said first strap splitter comprising a unitary body having a first slot in spaced relationship to a second slot, said first strap splitter having a fixed bar formed therewith and positioned between said first slot and said second slot, said second slot having a length that is greater than a length of said first slot,**

> **said first strap having a first portion and a**
> **second portion juxtaposed together in said**
> **first slot and angularly diverging from each**
> **in said second slot, said first portion and**
> **said second portion being angularly**
> **adjustable with respect to each other so as**
> **to allow one of said first and second**
> **portions to be attached to either the high**
> **hook-up or low hook-up of the helmet.**

Exhibit G, '160 Prosecution History Amendment "A", pp. 3-4 (WIL00555-56).  Schiebl also defined "strap splitter" more narrowly for the examiner in an effort to avoid another rejection:

> **strap splitter is defined as** a "unitary body"
> [with] a first slot in spaced relation to a
> second slot.  A "fixed" bar is formed with
> the unitary body and positioned between the
> first slot and the second slot.  It is
> indicated that the second slot has a length
> that is greater than the first slot.
> [Emphasis added]

Exhibit G, p. 8,(WIL00560).  The examiner then allowed the '160 Patent based on the amendment.

Schiebl filed the '671 Patent Application on July 25, 2011 as a continuation-in-part of the '160 Patent Application, with the same application date as the '160 Patent and the earlier abandoned, rejected '774 Application.  In the later '671 Patent Schiebl used the same term, "strap splitter," as expressly defined in the '160 Patent history.  Now that Schiebl had the narrowed definition of "strap splitter" from that first used in the '160 Patent, the examiner allowed the claims of the '671 Patent over the prior art.  Therefore Sportstar cannot go back and use the broader definition that was rejected.  *Festo*, 535 U.S. at 737.

The parties disagree about the meaning of the following claim terms or elements, #20-1 (Ex. A Sportstar) and 20-2 (Ex. B.

-24-

Wilson): "Strap splitter" (in claims 1,8,9,12, and 13 of the '160 patent (Ex C to #28) and claims 7,8,10, and 17 of the '671 patent (Ex. D)); "In said second slot" (in claims 1,9, and 12 of the '160 patent); "stop" (in claims 9 and 18 of the '671 patent); and "greater than" (in claims 1 and 9 of the '160 patent).   The following are the two parties' proposed constructions:

| Disputed Term | Sportstar's Construction | Wilson's Construction |
|---|---|---|
| strap splitter | a part of chin guard assembly, separate from the chin cup, through which two portions of a chin strap extending in line from the chin cup are separated at an angle | A unitary body with a first slot in spaced relation to a scond slot.  A "fixed" bar is formed with the unitary body and positioned between the first slot and the second slot, with the second slot having a length that is greater than the first slot |
| in said second slot | plain and ordinary meaning, no construction necessary; alternatively a slot is a narrow opening or slit | within the second single continuous opening |
| stop | plain and ordinary meaning, no construction necessary; alternatively something that impedes or prevents motion | rivet or plug |
| greater than | plain and ordinary meaning, no construction necessary | longer than |

The Court agrees with Wilson that its claim constructions are properly based on the patents' intrinsic evidence (claim language, specifications, and prosecution history)

and on the patentee's claim construction as his own
lexicographer.[15]

     With respect to "strap splitter, Wilson's construction
comes directly from the patentee's own definition in the
prosecution history. *See, e.g.,* Ex. G, '160 Prosecution History
Amendment "A," pp. 3-4 (WIL00555-56)(*supra* at p. 26 of this
Opinion and Order; same definition used in the '671 Patent).   In
contrast, Sportstar has now deleted the following language from
the prosecution history:  "Unitary body," "fixed bar," and "second
slot having a length that is greater than said first slot."
Schiebl deliberately amended his claims to narrow the definition
of strap splitter to overcome the examiner's rejection to and
other prior art references during the prosecution of the '160
Patent.   Therefore Sportstar is barred by prosecution history
estoppel from altering the definition now and expanding the
construction of the term "strap splitter."

     Nor can Sportstar use different definitions in the two
patents at issue, as it now seeks to do in order to broaden its
definition (#25, pp. 8-9).   Not only is the strap spliter of
Figure 1 of the '160 Patent essentially identical to Figure 7 of
the '671 Patent, but the specification of the '160 Patent and its
prosecution are binding on the continuation-in-part '671 Patent,
and Wilson's construction of "strap splinter" mirrors Schiebl's

---

[15] Although Sportsstar claims that Wilson misunderstands
the concept of a patentee acting as his own lexicographer and
conflates embodiments mentioned in the specification with
definitions, #19 at p.4, the Court disagrees and finds Wilson
quite clear and explicit in delineating the two.

definition in the '671 patent application without any modification or redefinition.   In amending and narrowing the construction of "strap splinter" in response to an Office Action that cited as prior art U.S. Patent No. 7,203,972 ("Pietrzak," Ex. F, which also disclosed a strap splitter for a helmet), Schiebl, as his own lexicographer, emphasized and defined the term to include exactly what Wilson now proposes as the correct construction of the term to overcome prior art cited against his claims and which is binding on the '671 continuation-in-part:

> In particular, in each of these claims, the strap splitter is defined as a "unitary body" [with] a first slot in spaced relation to a second slot.  A "fixed" bar is formed with the unitary body and positioned between the first slot and the second slot.   It is indicated that the second slot has a length that is greater than the first slot.

Ex. G, '160 Prosecution History Amendment "A," p. 8 (WIL00560); *Vasudevan Software, Inc. v. Microstrategy Inc.*, 782 F.3d 671, 679 (Fed. Cir. 2015)(patentee's definition, acting as lexicographer in the prosecution history, should be ascribed to the claim term). Schiebl distinguished Pietrzak as follows, Ex. G, pp. 11-12 (WIL0056):

> [I]t can be seen that the Pietrzak patent does not show a "unitary body."  There is no "fixed bar" formed with this unitary body. Each of the slots of the Pietrzak patent appear to be symmetrical with each other such that there is not a "second slot having a length that is greater than the length of the first slot" . . .  On this basis, Applicant contends that the Pietrzak patent in combination with the Schiebl and Rush patents does not show the structure, function, or results of the present invention. . . . [Ex. G, pp. 11-12 (WIL00563-64].

In contrast, the specification of the '160 Patent (Ex. B, Col. 6, ll. 52–59) discloses the "strap splinter" in manner similar to Schiebl's amended '160 Patent (with numbers referencing those in the drawings in Ex. B, Col. 6, ll. 52–59):

> The strap splitter 40 includes a body 66 formed of a polymeric material. A first slot 68 opens through the body 66. A second slot 70 is in spaced relationship to the first slot 68 and also open through the body. A bar 72 is formed between the slots 68 and 70. The slots 68 and 70 are configured so as to allow the strap portions 36 and 38 to pass therethrough and over the bar 72. The second slot 70 has a length that is greater than the first slot 68.

Estoppel arises when an amendment is made to secure the patent and the amendment narrows the patent's scope." *Festo*, 535 U.S. at 734. "A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter, whether the amendment was made to avoid prior art or to comply with § 112." *Id.* at 737. Sportstar bears the burden of establishing that an amendment was not made for reasons related to patentability. *Id.* at 739. "When the patentee is unable to explain the reason for amendment, estoppel not only applies, but also 'bar[s] the application of the doctrine of equivalents as to that element.'" *Id.* at 740. Whether the patentee has rebutted the presumption of surrender is a question of law for the Court. *Id.* at 740-41. The Court concludes that Schiebl and Sportstar have not rebutted that presumption of surrender here. Since Schiebl particularly narrowed the claims of the '160 Patent to overcome the PTO's rejection of his original application, he and

Sportstar cannot deny this prosecution history and recapture the surrendered subject matter.

Sportstar attempts to argue that "strap splitter" should mean something different in the two continuation-in-part patents in issue, i.e., that it is legal error to import limitations from the '160 Patent into the broader '671 Patent. #25 at pp. 8-9, 16. Prosecution history estoppel prevents such an effort and binds the '671 Patent to the specification and prosecution history of the '160 Patent. Neither patent mentions football, and the '160 Patent even states that the splitter is for bicycle helmets. Ex. B, ll. 34-36 ("The invention relates to improvements in protective headgear such as . . . bicycle helmets, and helmets for other activities where protection from head impact and injury is desirable."). Nevertheless because Schiebl's disclosures were restricted to football during the prosecution history to overcome Pietzrak, however, Sportstar is estopped from excluding that limitation and broadening the reach. Wilson's construction of "strap splitter" is supported by both the patents and the prosecution history and should not be amended and expanded as Sportstar requests.

With regard to the term "stop," here, too, Wilson defines the word as the '671 patent does and as Sportstar did a year ago in a similar suit, but from which definition it now tries to distance itself. *See* drawing of '671 Patent in Figure 8, #28 at p. 11, with stops as #114, 118, 122, and 124 (Ex. D). Wilson contends that Sportstar should not now be permitted to avoid its own previously asserted definition. The specification of the '671

Patent, "the single best guide to the meaning of a disputed term,"[16] written by Schiebl as his own lexicographer, uses the term "stop" three times and expressly defines it as a "rivet" (Ex. D, Col. 7, ll. 34-39, emphasis added by the Court):

> [T]he embodiment of FIG. 8 utilizes **stops** in order to allow the position of the straps 110 and 112 to be adjustably fixed. In particular, strap 110 has a first **rivet** 114 affixed to a first portion 116 adjacent to one side of the strap-receiving slot 106. Strap 110 has a second **rivet** 118 affixed to a second portion 120 adjacent to an opposite of the strap-receiving slot 106. Similarly, the strap 112 has a first **rivet** 122 adjacent one side of strap receiving slot 108 and a second **rivet** 124 adjacent to an opposite side of the strap-receiving slot 108. The **rivets** 114, 118, 122, and 124 extend outwardly of a surface of the receptive straps so as to have a thickness greater than the width of the respective strap-receiving slots 106 and 108. As such the **rivets** act as **stops** so as to prevent excessive movement of the shell 102 relative to the straps 110 and 112.
>     The use of the **rivets (or stops)** unexpectedly facilitates the ability to angularly adjust the straps 11- and 112 relative to the high and low hook-ups of the helmet. The **rivets** can be conveniently installed subsequent to the connection of the 50 shell 102 with the straps 110 and 112.

Sportstar now proposes a definition that broadens the term "stop" in an effort to reach the characteristics of Wilson's accused device: construing "stop" as a "rivet or a plug," or "alternatively an article which prevents one portion of the strap from sliding lengthwise past the other portion." Ex. H. Thus Sportstar modified and broadened its definition of "stop" to cover the characteristics of Wilson's accused device. If the patentee

---

[16] Phillips, 415 F.3d at 1315, to show that the patentee intended a meaning deviating from the ordinary meaning.

redefines the plain and ordinary meaning of a term during the prosecution history, in particular the specification, using words that manifest exclusion or restriction, i.e., a "clear disavowal" of claim scope, as Schiebl did here, the "inventor's lexicography governs." *Kwitek*, 516 F. Supp. 2d at 713, *citing Phillips*, 415 F.3d at 1316.   Wilson is entitled to rely on the inventor's statements in the specification.

Wilson construes "in said second slot" to mean "within the second single continuous opening," while Sportstar first argues to give the phrase its plain and ordinary meaning, with no construction necessary, and alternatively "a slot is a narrow opening or slit."   Wilson asserts that Sportstar impermissibly urges the Court to ignore the requirement that the second slot be one continuous slot.   Claim 1 of the '160 Patent teaches that the first and second straps are folded in two and subsequently become a low strap portion and a high strap portion as they extend from a slot in the chin cup and enter into the strap splitter, which has two slots: one shorter receiving slot through which the two strap portions pass side by side, and a second, longer slot through which the two straps pass while angularly diverging from each other "so as to allow one of the said first and second portions to be attached to either the high hook-up or low hook-up of the helmet." #25, Ex. B, Col. 9, ll. 1-2 and Figure 7.   Wilson explains that this limitation and narrowing of the patent was in response to a rejection and part of the narrowing amendment in response to the Pietrzak Patent, discussed earlier with respect to the strap splitter.   Wilson maintains that neither the prosecution

history, nor the claim language, nor the specification supports
Sportstar's construction.   Sportstar's proposal that "in said
second slot" means a "narrow opening or slit" ("an opening that is
longer than wide") merely describes a type of slot; the key point
of the element at issue is the angular divergence of the two strap
portions from one another within that slot.   Sportstar cannot
expand the reach of the limitation because the '160 Patent was
narrowed specifically to overcome a rejection.   *Graham*, 383 U.S.
at 33 ("claims that have been narrowed in order to obtain the
issuance of a patent by distinguishing the prior art cannot be
sustained to cover that which was previously by limitation
eliminated from the patent.").

    During his prosecution of the '160 Patent, Schiebl
argued that his claim elements were distinguished from Pietrzak by
the way in which the strap portions diverged within the single
second slot (#125, Ex. G, Amendment "A," pp. 11–12, WIL0000563-64:

> In particular, in each of these claims,
> the strap splitter is defined as a "unitary body"
> [with] a first slot in spaced relation to a
> second slot.   A "fixed" bar is formed with
> the unitary body and positioned between the
> first slot and the second slot.   It is
> indicated that the second slot has a length
> that is greater than the first slot.

    In the Pietrzak Patent, the slots appear to be
symmetrical with each other so that there is not a "second slot
having a length greater than the length of the first slot."   In
addition, the Pietrzak Patent does not even hint that the first
and second portions of the strap are "angularly adjustable" with
respect to each other to permit one of the first or second

portions to be hooked onto either the high hook-up or the low hook-up of the helmet.  Here again, the patent and the prosecution history support Wilson's construction.

Sportstar urges that "greater than" has its plain and ordinary meaning, with no construction necessary, while Wilson construes it as meaning "longer than," with "greater" referring to length rather than some other characteristic, such as weight. Claim 1 states that "said first strap splitter having a fixed bar formed therewith and positioned between said first slot and said second slot, said second slot having a length that is greater than a length of said first slot."  #25, Ex. B, Col. 8, ll. 60-64.  The '160 Patent also teaches that the "strap splitter" has two slots: the two parts of the strap go from the chin cup through the first slot of the strap splitter juxtaposed or on top of each other, and that leave from the longer second slot while angularly splitting from each other.  This limitation was employed to overcome a rejection in view of Pietrzak and therefore must be read narrowly to distinguish it from the strap splitter structure of Pietrzak. *See* drawings of the '160 Patent (Figure 5) and the Pietrzak Patent (Figure 3A), #25, p. 16.  The '160 Patent specification supports Wilson's construction in noting the "relatively long length" of the "slot," Ex. B, Col. 7, ll. 20-31, while Figure 5 shows that the slot is narrowed and elongated.  The prosecution history also supports Wilson's reading:  the Patent Office allowed the '160 Patent because the Pietrzak Patent had symmetrical half circle shaped holes (#25, Ex. F, Figure 3A) and same sized slots that were quite different from the shape of the slots of the '160

Patent, with, as Schiebl successfully argued, the '160's second slot being longer ("greater") than the length of the first slot" Ex. G, p. 11 (WIL0000563).  The two were clearly distinguished: "Relative to independent Claims 21 and 32 it can be seen that the Pietrzak patent does not show a "unitary body."  There is no "fixed bar" formed with this unitary body.  Each of the slots of the Pietzak patent appear to be symmetrical with each other such that there is not a "second slot having a length that is greater than the length of the first slot."  #25, Ex. G, Amendment "A," pp. 11-112 (WIL0000563-64).  In contrast, Wilson's accused strap splitter has three slots, all the same size and symmetrical with each other, i.e., the configuration that Schiebl moved away from to avoid rejection under Pietrzak.  #25, p. 2, Figure B.  Thus Sportstar is estopped from claiming that "greater than" does not need to mean longer in light of this patent and its prosecution history.

    To the extent that any of the Court's findings of fact should properly be designated conclusions of law, and vice versa, that mischaracterization shall not affect the determination of the Court.

    **SIGNED** at Houston, Texas, this __30th__ day of __January__, 2017.


    _____
          MELINDA HARMON
    UNITED STATES DISTRICT JUDGE